# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| EBONY L. FINDLEY, Next friend to T.P., | ) ) ) |
| and | ) ) |
| CHARISSE A. BROWN, Next friend to Y.K.P., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 23-00326-CV-W-BP ) |
| CITY OF INDEPENDENCE, MISSOURI,[1] | ) ) ) |
| HUNTER SOULE, | ) ) |
| and JAMIE WELSH, | ) ) ) |
| Defendants. | ) |

## ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case arises out of the shooting death of Tyrea Pryor by Defendants Hunter Soule and Jamie Welsh, officers with the Independence, Missouri Police Department. Now before the Court is Defendants' Motion for Summary Judgment, (Doc. 40), which is **GRANTED** with respect to Count I. Counts II and III are **DISMISSED WITHOUT PREJUDICE**.

## BACKGROUND

The parties have provided the Court with evidence regarding the evening Pryor was killed, including dash camera video from two angles, the sworn statements of several officers (including Defendants), and the depositions of both Defendants. The parties also agree on many of the facts

---

[1] This Defendant has previously been dismissed. (Doc. 23.)

and most of the remaining facts are uncontroverted in evidence.[2]  Citations are provided only where necessary or helpful.

On the evening of March 11, 2022, a 911 caller claimed that a man arrived at her home in a white sedan and was now banging on her front door.  Defendants responded to the caller's home in separate patrol cars.  As they arrived, a man, later identified as Tyrea Pryor, got into the driver's seat of a white Chevrolet in the driveway, joining two passengers.  As Welsh and Soule drove up to the house and parked, Pryor drove between the police cars and down the street.  (Doc. 41-8, at 1:04-1:10.)

Welsh and Soule, with lights and sirens on, pursued Pryor's car, but Pryor did not stop.  After a few blocks, Welsh and Soule stopped the pursuit for public safety reasons.  Less than a minute later, however, Pryor ran a red light, causing a car to crash into Pryor's car.

Welsh heard the collision, and Welsh and Soule were on the scene almost immediately.  Welsh arrived in his patrol car with his dash camera on, stopping directly behind where Pryor's car came to rest in the grass.   Welsh initially attended to the passengers of the car that struck Pryor's car.  Soule, who arrived separately, first approached Pryor and his passengers.  After a short time, Welsh joined Soule at Pryor's car, as did several newly arriving officers.  These officers included Jacob Pope and Alex Steele.  Like Welsh, Pope had his dash camera on and parked his patrol car perpendicular to Pryor's car on the passenger side.

While Welsh and Pope helped the passengers in Pryor's car, Soule approached Pryor, with his gun drawn.  The front of the car and the driver door were severely damaged and crumpled inward.  The window of the driver door was shattered, the windshield was cracked, and the airbags had deployed.  Soule testified that the airbag and the steering wheel obstructed his view of Pryor's

---

[2] Although Plaintiffs object to Defendants' characterization of some facts, the portions of the facts to which they object do not create a dispute of material fact relevant to the Court's analysis.

2

lap, but that he could tell Pryor was moving his hands around. (*See e.g.* Doc. 41-4, pp. 4-5.) Soule also testified that he could not tell the extent to which Pryor was injured, though he could not see much blood. Cindy Kendrick, the front seat passenger, said in her declaration that Pryor was pinned against the steering wheel just after the crash, including his hands. (Doc. 49-1, ¶ 14, 18.)

While Soule focused on Pryor, Pope and Welsh worked to extract the passengers from the car. Pope attended to the front-seat passenger, while Welsh helped the back seat passenger out of the car. Once the back-seat passenger was out of the car, Steele climbed in the back seat without announcing himself to the other officers. Soule and Welsh testified that they did not know what Steele was doing in the back seat. (Doc. 41-4, p. 6; Doc. 41-5, p. 5.) At this time, both Pope—still standing at the passenger door—and Steele observed a silver AR-15 rifle ("the rifle") between Pryor's right leg and the center console. The barrel of the gun was pointed forward and down with the stock extending towards the back seat, in a position where it would be "ready" to be used. (Doc. 49-6, p. 3.)[3] At this point, neither Steele nor Pope announced the rifle's presence; Soule and Welsh had not yet seen the rifle.

According to both Steele and Soule, Pryor was moving his hands around in the car. Steele first gave orders to Pryor not to "move it," in reference to the rifle. (Doc. 41-9, at 3:15.) Then, Soule told Pryor to get his hands up. (Doc. 41-4, p. 4; Doc. 41-9, at 3:20.) After another 30 seconds, in response to Pryor's continued movement, Soule ordered him not to move his hands. (Doc. 41-9, at 3:47.) Soule saw Pryor continuously "dip[ping] his hands down" below the steering wheel (where Soule could not see), as if Pryor was trying to grab at something. (Doc. 41-4, p. 4.)

---

[3] Doc. 49-6 is a report prepared by the Missouri Highway Patrol that reflects Steele's statements. Many of Steele's statements from the report are also reflected in an audio recording, which appears in the Record as Doc. 49-3. Plaintiffs rely on these unsworn statements to support several propositions, including this one. Defendants dispute some of the propositions contained in this evidence, but in doing so they do not argue that the Court cannot consider the evidence. The Court need not resolve whether it may consider this evidence because it does not create a factual dispute that justifies denying summary judgment.

3

At the same time Soule, reached into the car and grabbed Pryor's left arm to keep his hand in view. Pryor said "alright, alright!" in response.

While Soule gave orders to Pryor, Steele, still in the back seat, leaned forward trying to dislodge the rifle. According to Steele, Pryor's right hand was in his lap when Steele leaned forward. (Doc. 49-6, p. 2.) Steele grabbed the stock of the rifle and began to tug at it, trying to get it loose, but was unable to do so. (Doc. 41-6, p. 2.) Pope's dash camera video shows Steele leaned forward over the center console, attending to something next to Pryor. (Doc. 41-9, at 3:50-58.)

As this occurred, Soule held Pryor's left arm and Welsh asked, "where's his right arm?" Pope's dash cam shows Welsh leaning down towards the car and looking into the car. Abruptly, Welsh unholstered his weapon and yelled "he's got a gun!" (Doc. 41-8, at 5:38.)

According to Welsh and Soule, at this moment both men noticed the rifle for the first time. (Doc. 41-4, p. 8; Doc. 41-5, p. 7.) Soule said that he saw the stock move or rise, like it was being pulled up to shoot. (Doc. 41-4, p. 8-9.) Soule recognized the stock as a collapsible stock typical of an AR-15 rifle. (Doc. 41-4, p. 5.) Welsh says he saw the gun move upward towards him, (Doc. 41-5, p. 7), and he yelled out "put it down!" (Doc. 41-8, at 5:39.) Steele was still leaned forward next to Pryor's seat.[4] (Doc. 41-9, at 3:58.)

At almost exactly the same time, Welsh and Soule began to fire their weapons at Pryor. (Doc. 41-8, at 5:40; Doc. 41-9, at 3:59.) Both fired repeatedly, as they backed away from the car. Shortly after the officers fired their guns, Welsh's dash camera records (1) Steele crawling out of

---

[4] In a later interview with Missouri Highway Patrol, Steele stated that he had stopped reaching for the gun and had leaned back into the back seat when the shots were fired, (Doc. 49-3, at 5:00); however, Pope's dash camera video shows otherwise. Doc. 41-9, at 3:58-4:02.) Where there are no allegations or indications that video evidence is doctored or inaccurate, the Supreme Court has instructed that statements that blatantly contradict undisputed video evidence do not create a "genuine" dispute, and the court should view the evidence in the light of the video which is presumed more accurate than memory. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

4

the back passenger side of the car, (2) Soule calling for backup saying that Pryor had a gun in his right hand, and (3) Welsh saying that Pryor had been "pulling a gun" and that it was in Pryor's right hand. (Doc. 41-8, at 6:00-06.)

EMS arrived several minutes later and began attending to Pryor and the other passengers. EMS pronounced Pryor dead at the scene.

Plaintiffs filed this case against Defendants, asserting claims of excessive force under 42 U.S.C. § 1983 (Count I), and battery resulting in wrongful death (Count II), and gross negligence (Count III) under Missouri law. Following the close of discovery, Defendants filed a Motion for Summary Judgment on all counts.[5] The Court resolves the parties' arguments below.

## ANALYSIS

### A. Count I: Excessive Force

Defendants move for summary judgment on Count I. A moving party is entitled to summary judgment on a claim only after a showing that "there is no genuine issue of material fact and [that party] is entitled to a judgment as a matter of law." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012); Fed. R. Civ. P. 56(c). "A fact is material if it might affect the outcome of the suit," and a genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (cleaned up; citations omitted). "[A]ll justifiable inferences are to be drawn in favor of non-moving party." *Harry Stephens Farms, Inc. v. Wormald Americas, Inc.*, 571 F.3d 820, 821 (8th Cir. 2009) (per curiam) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255,

---

[5] Attached to Defendants' Motion was a memorandum containing the decision and written findings of the Jackson County Prosecuting Attorney's Office's Use of Force Committee, which reviewed the circumstances of Pryor's death. Plaintiffs objects to this document's inclusion, contending it would be inadmissible at trial and therefore it is improper to rely on it at this stage. *See* Fed. R. Civ. P. 56. The Court need not rule on the document's admissibility because the Court has not relied on the memorandum for its conclusions. The Court bases its conclusions on the parties' agreed upon facts, the dash camera videos, and the sworn statements and testimony of witnesses.

5

(1986)).  The non-moving party must point to evidence in the record demonstrating the existence of a factual dispute.  Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010).  The parties "cannot rest solely on . . . [m]ere allegations, unsupported by specific facts or evidence. . ." *Morgan v. A.G. Edwards & Sons*, *Inc*., 486 F.3d 1034, 1039 (8th Cir. 2007).  As these issues are before the Court on Defendants' Motion, the Court will examine the facts in the light most favorable to Plaintiffs and resolve any material inferences accordingly.

In suits for Constitutional violations under § 1983, "[q]ualified immunity shields a government official from liability and the burdens of litigation" unless (1) the official violated a statutory or constitutional right, and (2) that right was "clearly established" at the time of the violation.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  The two steps of a qualified immunity analysis can be analyzed in either order.  *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014).

"A right is clearly established if 'a reasonable official would understand that what he is doing violates that right.'"  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Existing precedent need not be directly on point, but it must place the constitutionality of the official's particular conduct "beyond debate."  *Ashcroft*, 563 U.S. at 741.  For the qualified immunity analysis, the Court must therefore determine what law was clearly established regarding use of deadly force at the time of Pryor's death.

A challenge to an officer's use of force is analyzed under the framework of seizures under the Fourth Amendment.  *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012).  The constitutionality of an officer's use of force depends on whether "under the totality of the circumstances, the officer's conduct was reasonable."  *Thompson v. Dill*, 930 F.3d 1008, 1013 (8th Cir. 2019) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)).  This analysis is objective

and does not concern the officer's "subjective intent or motivation." *Loch,* 689 F.3d at 965 (citing *Graham*, 490 U.S. at 397).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Courts judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Loch*, 689 F.3d at 965 (8th Cir. 2012) (citing *Graham*, 490 U.S. at 396). This reasonableness analysis must account for "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97; *see also Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012). Mistaken perception or belief does not preclude a determination that an act was reasonable under the Fourth Amendment if the response was reasonable in light of what was known or perceived at the time. *Loch*, 689 F.3d at 966 (citing *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993) and *Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th Cir. 2002)).

In this analysis, courts consider a variety of factors including (1) the severity of the crime, (2) whether the officer reasonably believed that the subject posed an immediate threat to their safety or the safety of someone else, (3) and whether the subject was fleeing or resisting arrest. *Loch*, 689 F.3d at 965 (internal citations omitted); *Nance v. Sammis*, 586 F.3d 604, 610 (8th Cir. 2009). Most relevant to the analysis here is the second factor, as all prior criminal activity or fleeing occurred prior to the accident and was relatively remote to the shooting. Under the second factor, the Court primarily considers whether Soule and Welsh reasonably believed Pryor was a safety threat to the officers.

The "mere presence of a gun" is not in itself enough to justify deadly force, *Partridge v. City of Benton, Arkansas*, 929 F.3d 562, 566 (8th Cir. 2019) (internal citations omitted), but the

7

Fourth Amendment does not prohibit deadly force when an officer is faced with a gun apparently about to be fired. *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001). When a firearm is a factor in a deadly force suit, "[w]here the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Partridge*, 929 F.3d at 566-67 (internal citations omitted).

In *Aipperspach v. McInerney*, the Eighth Circuit affirmed the grant of qualified immunity to an officer who used deadly force when "confronted with a suspect who held what appeared to be a handgun, refused repeated commands to drop the gun, pointed it once at [an officer], and then waved it in the direction of officers deployed along the ridge line in an action they perceived as menacing." 766 F.3d 803, 807 (8th Cir. 2014). To reach this finding, the court noted that an officer's use of force did not violate the Fourth Amendment in the following cases:

> "In *Loch*, the police officer reasonably believed the suspect had a gun, even though in fact the suspect had discarded his weapon before walking toward the officer. 689 F.3d at 966-67. In *Morgan*, the officer fatally shot a suspect armed only with a knife who disregarded repeated requests to drop his weapon and took a step in the officer's direction. 686 F.3d at 497-98. . . . In *Thompson v. Hubbard*. . . an officer . . . shot and killed an unarmed fleeing suspect, based on the officer's credible testimony that the suspect "looked over his shoulder . . . and moved his arms as though reaching for a weapon." 257 F.3d 896, 898-900 (8th Cir. 2001)."

*Id*. *Aipperspach* and the cases cited establish that officers may rely on circumstantial evidence to make conclusions about their safety for use of force purposes, even where those conclusions turn out to be mistaken.

The Court similarly concludes that because Welsh and Soule reasonably believed Pryor was a threat to their safety, qualified immunity shields them from suit. The Court identifies several undisputed facts material to Soule's and Welsh's perception of the circumstances prior to the shooting and the reasonableness of their response.

1) Pryor continued to move his hands after repeatedly being ordered not to.

8

2) The rifle in the car was an AR-15.
3) The rifle was next to Pryor in the car, in a ready to use position.
4) The rifle moved either up or back or both, as if it was being extracted from its position.

The evidence in this case, even when considered in the light most favorable to Plaintiffs, establishes that Pryor continuously moved his hands above and below the steering wheel. Pryor may have stopped moving immediately after each order, but the fact that officers had to give at least three orders for Pryor to stop moving his hands and raise them shows that he was not complaint with the officers' orders. While Plaintiffs point to Cindy Kendrick's statement as evidence to the contrary, Kendrick had her back to Pryor for the two minutes before Pryor was shot; thus, any statement she provides about the likelihood of Pryor's movement is speculative and does not create a dispute of fact. Pryor's repeated failure to follow orders would reasonably create concern about whether Pryor was reaching for the gun when the officers saw the gun move.

Next, the rifle was a semi-automatic weapon, capable of firing multiple rounds quickly. Soule knew the rifle was an AR-15 and, while Welsh believed that the gun was a pistol, pistols also have semi-automatic firing capacity. Further, the rifle was positioned next to Pryor where he could easily access and fire it quickly. These facts show that, had Pryor been intending to use the rifle, he could have quickly used it to shoot the officers.

The uncontroverted evidence also demonstrates that the rifle moved prior to the shooting. Welsh, Soule, Pope, and Steele—the four people who could see the rifle at the time of the shooting—agree that it moved, albeit, ascribing different causes to the movement. Welsh testified that he saw Pryor moving the weapon. Soule testified that he saw the rifle move up and/or back. Pope says that he saw Steele pull the rifle towards him in the back seat. Steele admits to tugging on the rifle, but being unable to completely dislodge it, in the moments before the shooting. These

9

accounts all agree that the rifle moved like someone was trying to remove it from its position next to Pryor's leg.

When Welsh and Soule saw the rifle move, both officers reasonably concluded Pryor was attempting to access the gun. Soule could not see Pryor's right hand except that it was tucked under the steering wheel where he saw the gun moving, while Welsh states he saw Pryor's hand on the gun.[6] Neither officer could see what Steele was doing at the time of the shooting and could not have known if Steele moved the rifle. Welsh and Soule reasonably believed that the gun moved because Pryor was attempting to raise it to shoot them. Under these circumstances, it was objectively reasonable for Welsh and Soule to conclude that deadly force was necessary.

Considering the evidence in the light most favorable to the Plaintiffs—and therefore concluding that Steele moved the rifle and, thus, Pryor was not a threat to officers—does not change the Court's conclusion. The undisputed evidence establishes that Welsh and Soule, unaware of Steele's actions in the back seat, could not have accounted for his interference. They did not see Steele moving the rifle and did not anticipate that Steele lifted the weapon rather than Pryor; therefore, Welsh and Soule reasonably attributed weapon's movement to Pryor. Although this mistaken perception had deadly consequences, it does not foreclose the application of qualified immunity to Soule and Welsh.[7]

---

[6] Plaintiffs rely heavily on Steele's statement that Pryor moved his hands towards his waistline and away from the rifle just prior to the shooting to argue Pryor was not a risk to officers. However, Soule and Welsh could not see movement below the wheel from where they were standing and were only aware of continued movement below their line of sight. Therefore, Soule and Welsh could not have considered this fact in deciding how to respond to the moving rifle and it holds little weight in the Court's analysis.

[7] The Court rejects Plaintiffs' argument that Eighth Circuit's holding in *Thompson v. Dill* is controlling. In *Thompson*, the Eighth Circuit upheld the district court's finding that a dispute of material fact regarding whether the officer could have seen what he claimed to see precluded application of qualified immunity. 930 F.3d 1008, 1011, 1014-15 (8th Cir. 2019). The Court finds no dispute of material fact as to whether the gun next to Pryor moved before officers fired their weapons.

10

Case 4:23-cv-00326-BP   Document 56   Filed 12/13/24   Page 10 of 12

Clearly established law allows police officers to use deadly force when faced with a firearm where they reasonably believed they would be shot with it. It was reasonable for Soule and Welsh to believe deadly force was necessary. Therefore, Soule and Welsh are entitled to qualified immunity on Count I.

### B. Counts II and III: the State Claims

Defendants also request summary judgment on Counts II and III; counts to which state law applies and for which the Court has only supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). Under § 1367(c)(3), the Court has discretion to decline to exercise supplemental jurisdiction over a claim if it has "dismissed all claims over which it has original jurisdiction." When exercising its discretion, a court should consider "judicial economy, convenience, fairness, and comity." *E.g.*, *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 221 (8th Cir. 1990). Factors which courts have found to have bearing on these considerations include the "stage [of the litigation], the difficulty of the state claim, the amount of time and energy already invested in it, . . . and the availability of a state forum." *E.g.*, *Marshall v. Green Giant Co.*, 942 F.2d 539, 549 (8th Cir. 1991) (internal quotation marks omitted). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered will point toward declining to exercise jurisdiction over the remaining state-law claims." *Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018) (internal quotations omitted) (cleaned up) (quoting *Cohill*, 484 U.S. at 350 n. 7). Courts should "exercise judicial restraint and avoid state law issues wherever possible." *Thomas v. Dickel*, 213 F.3d 1023, 1026 (8th Cir. 2000).[8]

---

[8] The parties have not raised this issue. Nonetheless, the Court is permitted to raise the issue *sua sponte*, *e.g., Porter v. Williams*, 436 F.3d 917, 920 (8th Cir. 2006) (holding trial court may *sua sponte* decline supplemental jurisdiction based on § 1367(c)(3)), and for the reasons stated in the text the Court discerns no need to solicit the parties' input.

Counts I and II, wrongful death by battery and negligence, are based solely on interpretation of state law and state public policy. Accordingly, the Court concludes it is preferable to decline jurisdiction and allow these issues of state and local law to be resolved by the state courts. The Court dismisses Counts II and III without prejudice.

## CONCLUSION

Because Defendants are entitled to by qualified immunity, summary judgment is granted for Defendants as to Count I. The Court declines supplemental jurisdiction over the remaining Counts. Accordingly, Defendants' Motion for Summary, (Doc. 40), is **GRANTED IN PART**, and Counts II and III are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

**IT IS SO ORDERED.**

DATE: December 13, 2024

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT